**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

AARON D.,[1]                                   **3:19-cv-01575-BR**

       **Plaintiff,**                        **OPINION AND ORDER**

**v.**

**Commissioner, Social**
**Security Administration,**

       **Defendant.**


**TIM D. WILBORN**
P.O. Box 370578
Las Vegas, NV 89137
(702) 240-0184

       Attorney for Plaintiff

**BILLY J. WILLIAMS**
United States Attorney
**RENATA GOWIE**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1003

**MICHAEL W. PILE**

---

[1] In the interest of privacy this Court uses only the first
name and the initial of the last name of the nongovernmental
party in this case.

1  - OPINION AND ORDER

Acting Regional Chief Counsel
**KATHERINE B. WATSON**
Social Security Administration
Office of the General Counsel
701 Fifth Avenue
Suite 2900 M/S221A
Seattle, WA 98104-7075
(206) 615-2139

            Attorneys for Defendant

**BROWN, Senior Judge.**

        Plaintiff Aaron D. seeks judicial review of a final decision

of the Commissioner of the Social Security Administration (SSA)

in which he denied Plaintiff's applications for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI)

and under Titles II and XVI of the Social Security Act.

        For the reasons that follow, the Court **AFFIRMS** the decision

of the Commissioner and **DISMISSES** this matter.


                    <u>**ADMINISTRATIVE HISTORY**</u>

        Plaintiff filed his applications for DIB and SSI on

August 1, 2016.  Tr. 179, 187.[2]  Plaintiff alleged a disability

onset date of August 1, 2014.  His applications were denied

initially and on reconsideration.  An Administrative Law Judge

(ALJ) held a hearing on September 25, 2018, at which Plaintiff

and a vocational expert (VE) testified.  Plaintiff was

_____

        [2] Citations to the official transcript of record filed by the
Commissioner on February 19, 2020, are referred to as "Tr."

represented by an attorney at the hearing.  Tr. 29-48.

On October 19, 2018, the ALJ issued an opinion in which he found Plaintiff is not disabled and, therefore, is not entitled to benefits.  Tr. 13-23.  Pursuant to 20 C.F.R. § 404.984(d) that decision became the final decision of the Commissioner on August 27, 2019, when the Appeals Council denied Plaintiff's request for review.  Tr. 1-6.  *See Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

## BACKGROUND

Plaintiff was born on August 9, 1987.  Tr. 179.  Plaintiff was 31 years old at the time of the hearing.  Plaintiff has a college degree.  Tr. 34.  Plaintiff has past relevant work experience as a customer-service representative.  Tr. 21.

Plaintiff alleges disability due to depression and anxiety. Tr. 50.

Except when noted, Plaintiff does not challenge the ALJ's summary of the medical evidence.  After carefully reviewing the medical records, this Court adopts the ALJ's summary of the medical evidence.  *See* Tr. 19-21.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th

3  - OPINION AND ORDER

Cir. 2012).  To meet this burden a claimant must demonstrate his inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.  *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g).  *See also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  *Molina*, 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)).  "It is more than a mere scintilla [of evidence] but less than a preponderance."  *Id.* (citing *Valentine*, 574 F.3d at 690).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir.

2009).  The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record.  *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its judgment for that of the Commissioner.  *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

## **DISABILITY ANALYSIS**

### I.   **The Regulatory Sequential Evaluation**

At Step One the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). *See also Keyser v. Comm'r of Soc. Sec.*, 648 F.3d 721, 724 (9th Cir. 2011).

At Step Two the claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairments or combination of impairments.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  *See also Keyser*, 648 F.3d at 724.

At Step Three the claimant is disabled if the Commissioner

determines the claimant's impairments meet or equal one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  *See also Keyser*, 648 F.3d at 724.  The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 (Listed Impairments).

If the Commissioner proceeds beyond Step Three, he must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations.  20 C.F.R. §§ 404.1520(e), 416.920(e).  *See also* Social Security Ruling (SSR) 96-8p.  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule." SSR 96-8p, at *1.  In other words, the Social Security Act does not require complete incapacity to be disabled.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir. 2011)(citing *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work he has done in the past.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See also Keyser*, 648 F.3d at 724.

If the Commissioner reaches Step Five, he must determine

whether the claimant is able to do any other work that exists in
the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v),
416.920(a)(4)(v).  *See also Keyser*, 648 F.3d at 724-25.  Here the
burden shifts to the Commissioner to show a significant number of
jobs exist in the national economy that the claimant can perform.
*Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th
Cir. 2010).  The Commissioner may satisfy this burden through the
testimony of a VE or by reference to the Medical-Vocational
Guidelines set forth in the regulations at 20 C.F.R. part 404,
subpart P, appendix 2.  If the Commissioner meets this burden,
the claimant is not disabled.  20 C.F.R. §§ 404.1520(g)(1),
416.920(g)(1).

## **ALJ'S FINDINGS**

At Step One the ALJ found Plaintiff has not engaged in
substantial gainful activity since his August 1, 2014, alleged
onset date.  Tr. 15.

At Step Two the ALJ found Plaintiff has the severe
impairments of depression and anxiety.  Tr. 15.  The ALJ found
Plaintiff's obesity is not a medically determinable impairment.
Tr. 16.

At Step Three the ALJ concluded Plaintiff's medically
determinable impairments or combination of impairments do not
meet or medically equal one of the listed impairments in 20

7  - OPINION AND ORDER

C.F.R. part 404, subpart P, appendix 1.  Tr. 18.  The ALJ found Plaintiff has the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: "the individual can understand, remember, and carry out simple instructions, but not complex instructions; he should not have public interaction; he could occasionally interact with coworkers, but he would work better alone."  Tr. 18.

At Step Four the ALJ found Plaintiff is unable to perform his past work.  Tr. 21.

At Step Five the ALJ found Plaintiff can perform other work that exists in the national economy.  Accordingly, the ALJ found Plaintiff is not disabled.  Tr. 22.


## DISCUSSION

Plaintiff contends the ALJ erred when he (1) partially rejected Plaintiff's testimony; (2) partially rejected the lay-witness statement of Plaintiff's mother, Mary D.; (3) partially rejected the opinion of Lindsay Heydenrych, Psy.D., examining psychologist; (4) did not include all of Plaintiff's limitations in his hypothetical to the VE; and (5) found at Step Five that Plaintiff can do other jobs that exist in the national economy.

**I.   The ALJ did not err when he partially rejected Plaintiff's testimony.**

Plaintiff alleges the ALJ erred when he partially rejected Plaintiff's testimony.

8  - OPINION AND ORDER

The ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014)(quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). The claimant need not show his "impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Garrison*, 759 F.3d at 1014 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). A claimant is not required to produce "objective medical evidence of the pain or fatigue itself, or the severity thereof." *Garrison*, 759 F.3d at 1014.

If the claimant satisfies the first step of this analysis and there is not any affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1014-15. *See also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (same). General assertions that the claimant's testimony is not credible are insufficient. *Parra v. Astrue*, 481 F.3d 742, 750

(9th Cir. 2007).  The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id*. (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

Plaintiff testified at the hearing that he cannot work because it is hard for him to "get out of isolation and when [he] get[s] in there, it's hard to get out."  Tr. 38.  Plaintiff stated he has trouble concentrating.  Although he stated he does not have trouble understanding things, he noted his anxiety "makes it so that [he] ha[s] to do things a little bit more and . . . go over things more often" to understand them.  Plaintiff testified "[o]ne of the major" reasons that he left his job was scheduling.  Tr. 40.  "To make an appointment with a full-time job was a little bit more intense than I anticipated.  It was very difficult to find time available.  I was out of work, on a day off, I couldn't leave the house."  Tr. 40.  Plaintiff stated he went to the grocery store "in the middle of the night" to avoid people and "would plan all [of his] outings around when there would be down time when people would be sleeping or at work.  If it was a really bad day [he] called in sick."  Tr. 41.  Plaintiff noted his impairments also "affected [his] motivation to do activities even when [he was] in [his] home."  Tr. 42.  For example, he "would start . . . watching TV with the family.  [He] wouldn't be able to follow and then [he] wouldn't remember what happened.  There would be just a blank spot or people would have

to remind [him] about things [he] would do around the house or
some particular thing." Tr. 42.  Plaintiff testified he had
trouble leaving the house after he stopped working and moved back
home because he was afraid of being "[i]nstantly recognized 10-15
years after high school." Tr. 43.  Plaintiff "thought [he] . . .
would have to come up with a story about why [he] was in town and
living with [his] parents.  That was on the surface.  [He] would
over think it and it would be too much to leave and [he] would
just stay home." Tr. 43.  Plaintiff noted there were times when
he was "in the community" and he "had to retreat." Tr. 43.  For
example, at a family gathering in a public restaurant he had "an
intense feeling of panic and something being wrong." Tr. 44.  He
did not, however, drive himself to the gathering, and, therefore,
he could not leave.  As a result, he "shut down and didn't talk
to anybody.  [He] looked down at [his] lap the entire time.
That's the worse [*sic*] [his anxiety] will get [when he] can't get
out of a situation." Tr. 44.  Plaintiff testified he has
"different levels of isolation or reclusive behavior." Tr. 45.
At his highest level he cannot "do anything no matter how much
forethought [he] put[s] into it or planning [he] do[es], [he]
can't get out of it." Tr. 45.  Plaintiff has these "exacerbated
episodes" approximately twice a week.  Plaintiff stated he
stopped doing behavioral therapy and went to a different program
at Civic University:

11 - OPINION AND ORDER

> The biggest issues were just not having people who
> knew the problems I was going through.  I needed
> very specific and more intense treatment.  It
> would often be that I would be the therapist.  I
> would have to do the therapist job for them and do
> research on the best treatment for people in my
> condition.  I looked up cognitive behavioral
> therapy worksheets online to print out and it got
> to the point of being ridiculous that I shouldn't
> have to be doing these people's jobs for them.  I
> expressed that to them.  They made some referrals.
> One of the doctors suggest I should give this
> specific university a try.

Tr. 42-43.  At first his treatment at Civic University was

"refreshing" because they were doing "cutting edge stuff they're

exploring and holistic.  They were very health minded about diet

and exercise."  Tr. 43.  Ultimately, however, "[i]t was kind of

the same deal with them.  I needed more intense treatment.  It

wasn't working out with them."  Tr. 43.

   The ALJ found Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged

symptoms," but Plaintiff's "statements concerning the intensity,

persistence and limiting effects of [his] symptoms are not

entirely consistent with the medical evidence and other evidence

in the record."  Tr. 18.  Specifically, the ALJ noted the record

reflects when Plaintiff undergoes therapy consistently and

follows a medication regimen, he has reduced symptoms of

depression and anxiety.  For example, in August 2013 Jamey

Burris-Fish, treating PMHNP, noted Plaintiff "appears to be

stabilizing on current medication regime."  Tr. 453.  In December

12 - OPINION AND ORDER

2014 Bryan Hagen, treating PMHNP, noted Plaintiff experiences anxiety, "but his ability to do certain performance tasks in front of people w/o issue rules out a formal social phobia" diagnosis. Tr. 577. In March 2015 Plaintiff reported "feeling improvement of mood with use of citalopram . . . . His gains have been limited, but . . . he has been leaving his home more often and [has been] nice to cashiers . . . for example." Tr. 598. In March 2015 Plaintiff also had some improvement in his "mood and motivation" when taking Adderall. At some point before June 2015 Plaintiff's insurance stopped paying for Adderall. In June 2015 Plaintiff reported Adderall had a "sig[nificant] benefit in stimulating activity during dysthymic episodes, and [Plaintiff] cont[inues] to tell a difference now 2wk after stopping d/t running out. Citalopram helpful in some ways in minimizing [Plaintiff's] anxiety, and he has been able to get out somewhat." Tr. 612. Plaintiff, however, also expressed frustration "w/lack of progress in therapy. Relates that he likes to have direct, explicit assignments from therapists so that he has to keep his word and follow through on these things. Finds group therapy helpful in this same way, that he is accountable to more than himself and would be better able to go through w/exercises that push his social anxiety." Tr. 612. PMHNP Hagen provided Plaintiff with a refill of Adderall. In October 2015 Plaintiff reported going to the Pacific University

anxiety clinic, which he "fe[lt was] doing more good than
anything."  Tr. 624.  Plaintiff also reported citalopram had been
"of benefit to his mood and partially to anxiety," and Adderall
"helps some" with his motivation issues.  Tr. 624.  In February
2016 Plaintiff reported having a "lower mood" for the previous
month, which he "attribute[d] to not having . . . Celexa."
Tr. 642.  Plaintiff, however, did not contact his mental-health
provider to ask for a refill in the previous month.

Plaintiff attended therapy at Pacific University throughout
2016.  In July 2016 Stephanie Culver, N.D., treating naturopath,
noted Plaintiff had "worsening flat affect and detached body
language."  Tr. 480.  Plaintiff advised Dr. Culver that he
intended to discontinue counseling and "possibly start OT in the
fall."  Tr. 480.  Plaintiff also advised Dr. Culver that he
intended to apply "for SSI disability pertaining to his mental
health."  Tr. 480.  Dr. Culver, however, noted it was her
"clinical opinion that he does not qualify for this and has a
very co-dependent lifestyle with his parents and lacks motivation
to succeed or create goals."  Tr. 480.  Nevertheless, Plaintiff
continued therapy at Pacific University and in August 2016
reported some improvement in his anxiety "after the changes made
to his pharmacotherapy."  Tr. 476.  In September 2016 Diane
Saunders, N.D., prescribed desvenlafaxine in addition to Celexa.
In October Dr. Saunders noted:

> While [Plaintiff] does not recognize any
> improvement in anxiety and depression after the
> initiation of desvenlafaxine 25mg, it was quite
> evident today that he had observable improvements
> in affect and demonstrated improvements in his
> motivation to do things to improve his mood, such
> as exercise and dietary changes.  I have not
> observed this level of improvement over the last 4
> months that I have been seeing him.  This
> improvement was reflected to him, and while he
> seemed hesitant to acknowledge it, he smiled and
> said he was thankful to hear it.

Tr. 470.

In November 2016 Plaintiff returned to Clatsop Behavioral
Healthcare (CBH) for the first time since February 2016.
Plaintiff reported to Melissa Bock, PMHNP, that his medications
were "working well for him," but he told her that he cannot work
or go to school "because of anxiety even though . . . meds are
helping him."  Tr. 650.  Plaintiff requested a prescription for
Adderall and noted his "provider in Portland wouldn't give it to
him."  Tr. 653.  PMHNP Bock agreed with PMHNP Hagen's note that
Plaintiff experiences anxiety, "but his ability to do certain
performance tasks in front of people w/o issue rules out a formal
social phobia" diagnosis.  Tr. 650.  In February 2017 Plaintiff
reported to Ann Haelan, PMHNP, that "he is more focused, able to
read, and his anxiety has diminished. . . .  He still ruminates
and has severe apprehension prior to social interactions."
Tr. 761.  PMHNP Hagen noted Plaintiff's "[a]nxiety persists, with
strong social traits, but his ability to do certain performance
tasks in front of people w/o issue rules out a formal social

15 - OPINION AND ORDER

phobia" diagnosis.  Tr. 761.

In March 2017 Plaintiff "slipped back into depression," which PMHNP Haelen noted "indicate[d] . . . [Plaintiff] was experiencing a placebo effect from his recent 'lift' from the Adderall."  Tr. 769.  In April 2017, however, Plaintiff advised PMHNP Haelen that he wanted to "stop all medication."  Tr. 777. Plaintiff had not been taking trazadone or clonazepam, but he "ha[d] been exercising, taking [a] probiotic and trying to socialize as much as possible."  Tr. 777.  Plaintiff agreed to taper off Celexa and to increase his dosage of Pristiq.  In May 2017 Plaintiff reported to PMHNP Bock that he was taking 20 mg of Adderall daily as well as 300 mg of Pristiq daily and that he "never went up to 400 mg [of Pristiq] as advised."  Tr. 793. Plaintiff stated his medications "work ok . . . 'better than nothing. . . .'  He states Adderall helps him concentrate better, does lift mood a little."  Tr. 793.  Plaintiff did not request any changes to his medication, but he agreed to increase his dosage of Pristiq to 400 mg per day.  In August 2017 Plaintiff was seen by PMHNP Bock for a three-month follow-up appointment. Plaintiff advised PMHNP Bock that "he takes Adderall 20 once daily with benefit, improves energy, helps with anxiety. . ., sleep is good.  He states the higher dose of Pristiq does work well for him."  Tr. 802.  In November 2017 at his three-month follow-up appointment Plaintiff advised PMHNP Bock that he was

"noticing improvement in frequency and severity and duration of depressed episodes since increasing Pristiq to 400mg daily. . . . Adderall does help with his depression he reports, able to focus and concentrate on daily activities.  States he is better with these medications than without."  Tr. 811.  After November 2017 the record does not contain notes from visits with PMHNP Bock.

In June 2018 Plaintiff was seen by Anisa Richardson, M.D., at Columbia Memorial Hospital to establish care.  Plaintiff told Dr. Richardson that he had been on 100 mg of Prestiq per day but he "went off it and [went] into withdrawal."  Tr. 1060. Plaintiff had been back on Prestiq for four days at the time of his appointment.  Plaintiff stated he had been "going to Portland for anxiety group therapy but [it was] not helpful. . . .  Does smoke pot and was accused of doing PCP by past provider.  Feels like CBH was not doing their job, 'dropped the ball' and acted inappropriately."  Tr. 1060.  Plaintiff noted he would be willing to undergo treatment at Oregon Health Sciences University.

In July 2018 PMHNP Bock wrote to Plaintiff and advised him that he had a vitamin D deficiency and elevated cholesterol. PMHNP Bock recommended Plaintiff see his primary-care provider to address these issues.  PMHNP Bock

> advise[d] [Plaintiff] to abstain from THC use as
> this is a major factor in brain health and
> [illegible] this will continue to be a barrier in
> improving your mental status, increasing energy
> and motivation.  I have to advise you that in
> order for me to continue to see you for medication

management, participating in treatment for this
substance is going to be required because of the
prohibitive effects that this presents in your
progress.

* * *

After further researching your drug screen, the
positive finding of phencyclidine could be a
result of taking Pristiq at the higher dose you
take.  In some cases, there are other OTC and
prescription medications that its metabolites
often cannot be distinguished from illicit
substances.  I did look into this in your case and
this is likely cause for showing a positive of
phencyclidine but is not conclusive.

Tr. 872.  PMHNP Bock also advised Plaintiff "to reconsider seeing

a therapist at CBH as part of and requirement for medication

management for a more comprehensive treatment plan."  Tr. 872.

The ALJ also noted Plaintiff asserts he suffers from social

anxiety, but, as noted, mental-health professionals stated

Plaintiff's "[a]nxiety persists, with strong social traits, but

his ability to do certain performance tasks in front of people

w/o issue rules out a formal social phobia" diagnosis.  Tr. 750,

761.  In addition, Plaintiff engaged in group therapy and found

it helpful, attended medical appointments, and went to dinner

with his family.

The Court concludes on this record that the ALJ did not err

when he partially rejected Plaintiff's testimony regarding the

intensity, persistence, and limiting effects of his symptoms

because the ALJ provided clear and convincing reasons supported

by substantial evidence in the record for doing so.

18 - OPINION AND ORDER

**II.  The ALJ did not err when he partially rejected the lay-witness statement of Plaintiff's mother, Mary D.**

Plaintiff alleges the ALJ erred when he partially rejected the lay-witness statement of Plaintiff's mother, Mary D.

Lay-witness testimony regarding a claimant's symptoms is competent evidence that the ALJ must consider unless he "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). *See also Merrill ex rel. Merrill v. Apfel*, 224 F.3d 1083, 1085 (9th Cir. 2000)("[A]n ALJ, in determining a claimant's disability, must give full consideration to the testimony of friends and family members."). The ALJ's reasons for rejecting lay-witness testimony must also be "specific." *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006).

On August 7, 2016, Mary D. completed a Third-Party Function Report in which she stated Plaintiff suffers symptoms and limitations similar to those set out by Plaintiff in his testimony.  Specifically, she stated Plaintiff's anxiety has "become severe," and he is unable to leave the house except with "extreme difficulty."  Tr. 220.  She also stated Plaintiff does not engage in any social activities, he has "paranoia when [he is] outside around people," and he is "unable to formulate thoughts verbally" when in public.  Tr. 226.

The ALJ gave little weight to Mary D.'s statement on the grounds that it is not supported by medical evidence in the record and is based in part on Plaintiff's self-reported symptoms, which the Court has already concluded the ALJ properly partially rejected.  Germane reasons for discrediting lay-witness testimony include inconsistency with the medical evidence and the fact that the testimony "generally repeat[s]" the properly discredited testimony of a claimant.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).  *See also Williams v. Astrue*, 493 F. App'x 866 (9th Cir. 2012); *Molina*, 674 F.3d at 1117 (When a lay witness does not describe limitations beyond those described by Plaintiff and the ALJ properly rejected the Plaintiff's subjective symptom testimony, any error in rejecting the lay-witness testimony would be harmless.).

The Court concludes on this record that the ALJ did not err when he partially rejected Mary D.'s Third-Party Function Report because the ALJ gave reasons germane to Mary D. supported by substantial evidence in the record.

**III.  The ALJ did not err when he gave only "some weight" to the opinion of Dr. Heydenrych, examining psychologist.**

Plaintiff asserts the ALJ erred when he gave only some weight to the opinion of Dr. Heydenrych.

An ALJ may reject an examining physician's opinion when it is inconsistent with the opinions of other treating or examining

physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).  When the medical opinion of an examining physician is uncontroverted, however, the ALJ must give "clear and convincing reasons" for rejecting it.  *Thomas*, 278 F.3d at 957.  *See also Lester v. Chater*, 81 F.3d 821, 830-32 (9th Cir. 1996).

On July 28, 2011, Dr. Heydenrych completed a psychological evaluation of Plaintiff.  Dr. Heydenrych diagnosed Plaintiff with Dysthymic Disorder, Social Phobia, and Avoidant Personality Disorder and noted Plaintiff

> reports, and elevated measures also highlight[,] [Plaintiff's] social and performance related anxiety, particularly with casual social encounters, meeting unfamiliar people, and with performance related situations such as taking examinations.  Although he denied that he feels embarrassment, he acknowledged that he feels inadequate, and fears being perceived as such. He feels such anxiety in these situations that he avoids them whenever possible, or endures them with much distress.
>
> * * *
>
> [Plaintiff] endorses, and psychological measures indicate, avoidance of activities that involve significant interpersonal contact, for fear of disapproval, an unwillingness to become involved with others unless certain of approval, restraint within and general avoidance of intimate relationships, and pervasive feelings of inadequacy and inferiority.

Tr. 451.  Dr. Heydenrych recommended a number of academic

accommodations including extended testing time, "examinations administered in a distraction-reduced environment," advanced copies of lecture notes, extended due dates for written assignments, and a reduced academic course load.  Dr. Heydenrych also recommended Plaintiff obtain tutoring and "continue with psychotherapeutic treatment."  Tr. 452.

The ALJ gave only some weight to Dr. Heydenrych's opinion on the grounds that the evaluation occurred more than three years before Plaintiff's alleged onset date; his opinion is inconsistent with treatment records during the relevant period; and, as noted, the record reflects consistent therapy and medication has been effective in reducing Plaintiff's mental-health issues.

On this record the Court concludes the ALJ did not err when he gave only some weight to Dr. Heydenrych's opinion because the ALJ provided clear and convincing reasons for doing so based on substantial evidence in the record.  *See, e.g., Baker v. Berryhill*, 720 F. App'x 352, 355 (9th Cir. 2017)("The ALJ did not err by not discussing evidence from three psychologists who evaluated Baker prior to her alleged onset date, as ALJs are not required to discuss evidence 'that is neither significant nor probative,' *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003), and medical opinions predating the alleged onset date 'are of limited relevance,' *Carmickle v. Comm'r, Soc. Sec.*

22 - OPINION AND ORDER

*Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008)."); *Montoya v. Colvin*, 649 F. App'x 429, 430 (9th Cir. 2016)(The ALJ gave sufficiently "specific and legitimate reasons" for giving little weight to the opinion of the plaintiff's treating physician, including the fact that "the opinion was rendered before the alleged onset date.").

## IV. The ALJ did not fail to include all of Plaintiff's limitations in his hypothetical to the VE.

Plaintiff alleges the ALJ erred when he failed to include all of Plaintiff's limitations in his hypothetical to the VE. Specifically, Plaintiff alleges the ALJ failed to include limitations identified by Plaintiff in his testimony, by Mary D. in her statement, and by Dr. Heydenrych in her opinion.

As noted, at Step Five the Commissioner must show the claimant can do other work that exists in the national economy. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).  The Commissioner can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all of the claimant's limitations.  *Id.*  The ALJ's hypothetical posed to a VE, however, only has to include those limitations supported by substantial evidence in the record.  *Robbins v. Soc. Sec. Admin.,* 466 F.3d 883, 866 (9th Cir. 2006).

The Court has already concluded the ALJ did not err when he rejected portions of Plaintiff's alleged limitations asserted by

23 - OPINION AND ORDER

Plaintiff, Mary D., and Dr. Heydenrych.  On this record,
therefore, the Court also concludes ALJ did not err when he did
not include those limitations in his hypothetical to the VE.

**V.    The ALJ did not err when he found at Step Five that
      Plaintiff can do other jobs that exist in the national
      economy.**

Plaintiff asserts the ALJ erred when he found at Step Five
that Plaintiff can do other jobs that exist in the national
economy.

If the Commissioner reaches Step Five, he must determine
whether the claimant is able to do any other work that exists in
the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v),
416.920(a)(4)(v).  *See also Keyser*, 648 F.3d at 724-25.  Here the
burden shifts to the Commissioner to show a significant number of
jobs exist in the national economy that the claimant can perform.
*Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th
Cir. 2010).  The Commissioner may satisfy this burden through the
testimony of a VE or by reference to the Medical-Vocational
Guidelines set forth in the regulations at 20 C.F.R. part 404,
subpart P, appendix 2.  If the Commissioner meets this burden,
the claimant is not disabled.  20 C.F.R. §§ 404.1520(g)(1),
416.920(g)(1).

The ALJ found in his evaluation of Plaintiff's RFC that
Plaintiff can "understand, remember, and carry out simple
instructions, but not complex instructions."  Tr. 18.  At the

24 - OPINION AND ORDER

hearing the ALJ asked the VE if there were jobs in the national economy for a hypothetical individual who can "[u]nderstand, remember, and carry out simple instructions, but not complex instructions."  Tr. 45.  The VE testified such an individual could perform the jobs of "laboratory equipment cleaner, . . . medium, SVP-2" and "industrial cleaner, . . . medium, SVP-2."  Tr. 46.  The ALJ proceeded to find at Step Five that Plaintiff can perform other work that exists in the national economy such as laboratory-equipment cleaner and industrial cleaner.

Plaintiff alleges the ALJ erred when he found at Step Five that Plaintiff can perform work as a laboratory-equipment cleaner and industrial cleaner because both of those jobs have an SVP level of two, but the ALJ also found Plaintiff can understand, remember, and carry out only simple instructions.  According to Plaintiff, therefore, the ALJ's findings at Step Five did not comport with his assessment of Plaintiff's RFC.  Defendant, on the other hand, points out that courts in the Ninth Circuit have consistently held a limitation to simple or routine work is consistent with level two reasoning.

The Dictionary of Occupational Titles (DOT) contains six GED Reasoning Levels that range from Level One to Level Six.  *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles* App. C (4th ed. 1991).  The DOT defines Reasoning Level 1 as the ability to "[a]pply commonsense understanding to carry out simple one- or

two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id*.  The DOT defines Reasoning Level 2 as the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variable in or from standardized situations." *Id*.

Plaintiff relies on *Rounds v. Commissioner of Social Security Administration*, 807 F.3d 996 (9th Cir. 2015), to support his assertion that an RFC permitting him to perform jobs with reasoning levels up to 2 does not comport with the ALJ's evaluation of Plaintiff's RFC.  In *Rounds* the Ninth Circuit held "there [is] an apparent conflict between [the plaintiff's] RFC, which limits her to performing one- and two-step tasks, and the demands of Level Two reasoning."  807 F.3d at 1003.  Here, however, the ALJ did not find Plaintiff is limited to one and two-step tasks.  Instead, as noted, the ALJ found Plaintiff is able to understand, to remember, and to carry out simple instructions.  In *Rounds* the Ninth Circuit specifically noted its holding did not extend to instances when the claimant retained the RFC to perform "simple or repetitive tasks."  *Id*. at 1004 (citations omitted).  In fact, the court noted with approval that "decisions of panels of this Court and opinions from some of our sister circuits have concluded that an RFC limitation to simple

26 - OPINION AND ORDER

or repetitive tasks is consistent with Level Two reasoning." *Id.* at 1004, n.6 (citing *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010); *Abrew v. Astrue*, 303 F. App'x 567, 569 (9th Cir. 2008); *Lara v. Astrue*, 305 F. App'x 324, 326 (9th Cir. 2008); *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005); *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004)). *See also Xiong v. Comm'r of Soc. Sec.*, No. 1:09-CCV-00398-SMS, 2010 WL 2902508, at *6 (E.D. Cal. July 22, 2010)(collecting district court cases in the Ninth Circuit in which courts held a limitation to simple or routine instructions encompasses reasoning levels one and two).

On this record the Court concludes the ALJ did err when he found at Step Five that Plaintiff could perform other jobs in the national economy.

**<u>CONCLUSION</u>**

For these reasons, the Court **AFFIRMS** the decision of the Commissioner and **DISMISSES** this matter pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

DATED this 26th day of August, 2020.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge

27 - OPINION AND ORDER